**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 9 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID BURTON,

       Plaintiff - Appellee,

v.

R.J. REYNOLDS TOBACCO
COMPANY,

       Defendant - Appellant.

No. 02-3262

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 94-CV-2202-JWL)**

---

Robert H. Klonoff, Jones Day, Washington, D.C. (Paul R. Reichert, Jones Day, Washington, D.C., and M. Warren McCamish, Williamson & Cubbison, Kansas City, Kansas, and Sydney McDole and Catherine L. Bjorck, Jones Day, Dallas, Texas, with him on the briefs) for Defendant-Appellant.

Kenneth B. McClain (Donald H. Loudon, Jr., and Scott B. Hall, with him on the brief), Humphrey Farrington & McClain, P.C., Independence, Missouri, for Plaintiff-Appellee.

---

Before **EBEL**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

David Burton ("Burton") sued R.J. Reynolds Tobacco Co. ("Reynolds") alleging that it caused the loss of his legs by fraudulently concealing, failing to warn of, and failing to test for the dangers of cigarette smoking. After a thirteen day trial, the jury found in Burton's favor on three of his claims for relief, authorized punitive damages, and awarded Burton $196,416 in compensatory damages. Subsequently, the court awarded Burton $15 million in punitive damages. Reynolds appeals the jury verdict and award of compensatory and punitive damages. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and **REVERSE** the jury's verdict on liability in part, **REVERSE** the dependent award of punitive damages, and **AFFIRM** other aspects of the judgment.

## I

In 1950, around the same time he quit high school to help support his mother, brothers, and sisters, plaintiff David Burton began to smoke Camel and Lucky Strike cigarettes. He was 14 or 15 years old. For the next 43 years, Burton continued to smoke because, as he explained, he enjoyed the taste. Burton did not go to physicians for check-ups and claimed to have never been sick. It was not until the summer of 1993, when Burton began to develop problems walking due to poor circulation, that he went to see a physician. His treating physician informed him that his circulation problems were caused by his cigarette smoking and advised him to "stop smoking or his legs were going to rot off." Doubting

whether cigarettes were causing his leg problems, Burton sought two other medical opinions, both of which confirmed the initial diagnosis. The third doctor recommended vascular bypass surgery in order to resolve his circulatory problems. In the meantime, despite his doctors' warnings, he did not initially attempt to quit smoking. In the fall of 1993, Burton underwent the recommended bypass surgery, which was unsuccessful, and shortly thereafter both of his legs were amputated below the knee. He stopped smoking while he was admitted to the hospital but started again after he was discharged. Burton finally quit smoking when, as he recounts, his physician warned him: "If it took your legs, it will take your arms."

Following the amputation of his legs, Burton brought this products liability action in 1994 against Defendants, Reynolds, the manufacturer of Camel cigarettes, and The American Tobacco Co. ("American"), the manufacturer of Lucky Strike cigarettes. Basing his complaint on the fact that he had been addicted to cigarettes and that cigarette smoking caused his peripheral vascular disease ("PVD"), he alleged numerous claims under Kansas law, including defective design, negligent failure to warn, negligent failure to test, breach of express warranty, fraudulent concealment, conspiracy to conceal, and fraudulent misrepresentation.

In 1995, the district court granted defendants' joint motion for summary judgment in part, and dismissed Burton's fraudulent misrepresentation and breach of express warranty claims. Burton v. R.J. Reynolds Tobacco Co., 884 F. Supp. 1515, 1527-28 (D. Kan. 1995). The court also dismissed any claims based on a post-1969 failure to warn as preempted by the Public Health Cigarette Smoking Act of 1969 ("1969 Act"). 15 U.S.C. §§ 1331-1340; Burton, 884 F. Supp. at 1521.

Proceeding to trial on the remaining claims in 2002, a jury returned a verdict for Burton on his fraudulent concealment, pre-1969 negligent failure to warn, and negligent failure to test claims. Burton v. R.J. Reynolds Tobacco Co., 205 F. Supp. 2d 1253, 1255 (D. Kan. 2002).

In awarding compensatory damages in the amount of $196,416 against Reynolds and $1,984 against American, the jury also authorized an award of punitive damages against Reynolds based on Burton's fraudulent concealment claim. Id. Pursuant to this authorization, the district court awarded Burton punitive damages in the amount of $15 million. Id. Defendants' motion for judgment as a matter of law and, in the alternative, for a new trial, having been denied, Burton v. R.J. Reynolds Tobacco Co., 208 F. Supp. 2d 1187, 1214 (D. Kan. 2002), Reynolds now appeals.

**II**

- 4 -

With regard to the jury's verdict on Burton's fraudulent concealment claim, Burton v. R.J. Reynolds Tobacco Co., 205 F. Supp. 2d 1253, 1255 (D. Kan. 2002), Reynolds argues, first, that Kansas courts would not recognize a claim for fraudulent concealment under the facts of this case, and, second, that the verdict is not supported by sufficient evidence. Because we agree with Reynolds' first contention, we need not address the second.

**A**

We review a district court's interpretation of state law de novo. Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000). Under Kansas law, to establish fraudulent concealment, or "fraud by silence," the plaintiff must prove by clear and convincing evidence that: (1) the defendant had knowledge of material information the plaintiff did not have and could not have discovered through the exercise of reasonable diligence; (2) the defendant had a duty to communicate that information to the plaintiff; (3) the defendant deliberately failed to communicate the information to the plaintiff; (4) the plaintiff justifiably relied on the defendant to communicate the information; and (5) the plaintiff was injured by the defendant's failure to communicate the information. Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman, 978 P.2d 922, 932 (Kan. 1999).

Not every nondisclosure is a fraudulent concealment. Robinson v. Shah, 936 P.2d 784, 790 (Kan. Ct. App. 1997). Nondisclosure becomes fraudulent only when it violates a duty to disclose. See id. "A party has a duty to disclose material facts if the party knows that the other is about to enter into the transaction under mistake as to such facts, and that the other, because of the relationship between them . . . would reasonably expect disclosure of such facts." OMI Holdings, Inc. v. Howell, 918 P.2d 1274, 1300-01 (Kan. 1996). Such relationships giving rise to the duty to disclose may include certain kinds of disparate contractual relationships, as well as fiduciary relationships. See DuShane v. Union Nat'l Bank, 576 P.2d 674, 679 (Kan. 1978) (holding that a duty to disclose may arise "between two contracting parties when there is a disparity of bargaining powers or of expertise," or "[i]f the parties to a bargain are in a fiduciary relationship to one another"); Flight Concepts Ltd. P'ship v. Boeing Co., 38 F.3d 1152, 1158 (10th Cir. 1994) ("The duty to disclose arises under Kansas law when there is a fiduciary relationship which may be created by contract or may arise from the relationship of the parties.").

Burton does not suggest that Reynolds was bound by a contractual relationship creating a fiduciary duty, but does argue that Reynolds owed him a fiduciary duty nonetheless. Kansas courts have identified the following principles to consider in determining whether a non-contractual fiduciary relationship exists:

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act *primarily for the benefit of another*. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

Denison State Bank v. Madeira, 640 P.2d 1235, 1241 (Kan. 1982) (emphasis added). Cautioning against an approach to fiduciary relationships that would "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated," id. at 1243, Kansas courts have warned that: "one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." Id. at 1243-44 (holding no fiduciary relationship existed between bank and debtor). Moreover, we have noted that under Kansas law a fiduciary duty must be consciously assumed. Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir. 1990) (applying Kansas law).

Because no Kansas authority has determined whether an ordinary consumer transaction for the sale of a product creates a fiduciary relationship between the product manufacturer and the consumer, we must determine how Kansas courts would decide the issue. See United States v. DeGasso, 369 F.3d 1139, 1145-46 (10th Cir. 2004) (federal courts predict state court interpretations in light of state

appellate court opinions, decisions from other jurisdictions, statutes, and treatises). Applying Kansas law, however, a federal district court has stated:

> A buyer/seller relationship does not create a fiduciary duty because the parties are dealing at arm's length and seeking for themselves the best advantage. . . . Since it almost goes without saying that the seller of a product will likely know more about its features and capabilities than would the buyer, this superior knowledge is hardly a basis for grounding a fiduciary relationship.

Ritchie Enterprises v. Honeywell Bull, Inc., 730 F. Supp. 1041, 1053-54 (D. Kan. 1990) (internal quotations and alterations omitted). In general, other courts recognize that the relationship between a product buyer and seller does not of itself create a fiduciary obligation. See 37 C.J.S. Fraud § 6 (2003) ("Most business or contractual relationships, such as those between buyer and seller . . . do not of themselves create fiduciary obligations."); 63A Am. Jur. 2d Products Liability § 892 (2003) ("Absent a confidential relationship between seller and buyer, the product seller has no duty to speak, which is necessary to make silence the equivalent of fraudulent concealment."); State v. Parris, 578 S.E.2d 736, 742-43 (S.C. Ct. App. 2003) (collecting cases).

Without focusing on the specific requirements necessary to establish a "duty to disclose" as a predicate for finding fraudulent concealment under Kansas law, the district court relied on Tetuan v. A.H. Robins Co., 738 P.2d 1210 (Kan. 1987), to support the claim for fraudulent concealment. In Tetuan, the court upheld a verdict finding that the manufacturer of her prescription intrauterine

device, fraudulently misrepresented and/or concealed the dangers of the device. Id. at 1216, 1228-32. As we read the case, however, Tetuan does not eliminate the necessity of proving either a special or fiduciary relationship that creates the duty to disclose in a fraudulent concealment claim

To the extent that Tetuan endorsed a fraudulent concealment claim against manufacturers of prescription medical devices in a product liability lawsuit, we do not believe that Kansas courts would extend that endorsement to fraudulent concealment claims against a manufacturer of cigarettes. Tetuan involved an "ethical" (i.e., prescription) device, a fact we find significant for two reasons. First, Kansas recognizes that ethical drug and device manufacturers owe a continuing, post-sale duty to warn of product dangers, whereas manufacturers of other products generally owe a duty to warn of product dangers only at the time of sale.[1] See Patton v. Hutchinson Wil-Rich Manufacturing Co., 861 P.2d 1299, 1309 (Kan. 1993); Richter v. Limax Int'l, Inc., 45 F.3d 1464, 1467 n.3 (10th Cir. 1995). Accordingly, the sale of an ethical drug or device establishes a continuing relationship between the manufacturer and the patient, a relationship which does not exist between a cigarette manufacturer and purchaser.

---

[1] Kansas also recognizes that manufacturers have a post-sale duty to warn purchasers who "can be readily identified or traced" by the manufacturer. Patton, 861 P.2d at 1313.

Second, patients who receive medical prescriptions necessarily trust others to act in their best interest. Authority and control over the patient's medical well-being is placed in the hands of another – namely, the patient's physician, pharmacies, and the pharmaceutical companies charged with apprising physicians and patients of the information necessary for the safe and effective administration of the product and follow-up. Accordingly, the relationship imparts a "peculiar confidence placed by one individual in another" and is therefore reasonably considered a "fiduciary" relationship under Kansas law. See Denison State Bank, 640 P.2d at 1241. The same cannot be said, however, of non-prescription products chosen exclusively by the consumer. Cf. OMI Holdings, 918 P.2d at 1301-02 (suggesting that Tetuan's holding may be limited to situations involving learned intermediaries or ethical products). In light of the cautionary approach to fiduciary relationships mandated by the Kansas courts, and in light of the weight of core authority holding that the relationship between a product buyer and seller is not fiduciary in nature, we conclude that ordinary transactions for the sale of cigarettes do not, as a matter of Kansas law, create such fiduciary relationships.

Because a fiduciary relationship does not arise, claims that a cigarette manufacturer has not warned of known product dangers are generally not cognizable as fraudulent concealment claims under Kansas law. Rather, they are cognizable as failure to warn claims. See Hamner v. BMY Combat Sys., 869 F.

Supp. 888, 893 (D. Kan. 1994) (applying Kansas law).  To hold otherwise would convert all product manufacturer's duty to warn claims into fraud claims.  We do not believe Kansas courts would intend such a result.  Cf. Bonin v. Vannaman, 929 P.2d 754, 764-65 (Kan. 1996) (holding that even if all elements of fraudulent concealment are satisfied, plaintiff has no fraudulent concealment claim against physician for what is in essence a medical malpractice claim).

In apparent recognition of these problems,  Burton claims that his purchase of cigarettes from Reynolds was not an ordinary consumer transaction because Reynolds affirmatively led consumers to believe that Reynolds was diligently investigating the harmful effects of its products and would promptly disclose health and safety information to the public.  In support of this argument,  Burton points to Reynolds' publication in 1954 of the Frank Statement to Cigarette Smokers.  In the Frank Statement, Reynolds and other tobacco companies stated that "[w]e accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business," and pledged "aid and assistance to the research effort into all phases of tobacco use and health."  To this end, the Frank Statement announced the creation of the Tobacco Industry Research Council, composed of representatives of the various tobacco companies. Burton appears to argue that the Frank Statement induced Burton's reliance on Reynolds to provide health and safety information to him, thereby creating a

- 11 -

fiduciary duty that extended beyond a manufacturer's ordinary duty to warn of product dangers.

Burton's apparent argument is belied by his clear testimony that he did not learn of the Tobacco Industry Research Council or the Frank Statement until initiation of this litigation. Thus, he could not have relied on that organization or that publication in making his decision to smoke Camel cigarettes, and no duty to him thereby could have been created. We leave for another day the question whether Reynolds' publication of the Frank Statement may have created a fiduciary duty running from Reynolds to other smokers who actually relied on the Frank Statement in making a decision to smoke. Burton has pointed to no evidence, however, that Reynolds owed him a fiduciary duty as a result of the Frank Statement. His purchases of Camel cigarettes were no more than "ordinary day-to-day business transactions" that we will not convert into fiduciary relationships. See Denison State Bank, 640 P.2d at 1243.

In sum, we decline to recognize a theory of fiduciary duty and fraudulent concealment which is unlike any yet recognized by the Kansas courts. "Federal court is not the place to press innovative theories of state law." Villegas v. Princeton Farms, Inc., 893 F.2d 919, 925 (7th Cir. 1990). We hold that Kansas courts would not recognize Burton's claim for fraudulent concealment because, on the record before us, Burton failed to establish that Reynolds owed him a

fiduciary duty.  Accordingly, because Burton has failed to state a claim for fraudulent concealment under Kansas law, the jury's verdict on this claim must be reversed.  Furthermore, because we reverse the jury verdict on fraudulent concealment, it is unnecessary to consider Reynolds' contention that the fraudulent concealment verdict is not supported by sufficient evidence.  We therefore **REVERSE** the jury's verdict on Burton's fraudulent concealment claim and remand for entry of judgment as a matter of law in favor of Reynolds on this claim.

**B**

Because we have reversed the jury's determination on fraudulent concealment, the trial court's award of $15 million in punitive damages, premised solely on the jury's finding for Burton on the fraudulent concealment claim, must be reversed as well.  Burton, 205 F. Supp. 2d at 1255.  It is thus unnecessary to address the constitutionality of the district court's award of punitive damages.

**III**

The jury also rendered a verdict in Burton's favor on his pre-1969 negligent failure to warn claim.  Burton, 205 F. Supp. 2d at 1255.  In seeking reversal, Reynolds argues that:  (1) the statute of limitations bars Burton's addiction based failure to warn claim, and (2) the jury's verdict on Burton's PVD based failure to warn claim is not supported by sufficient evidence.  We reject both arguments.

Applying the substantive law of Kansas in this diversity case, we review denials of motions for a directed verdict and for a judgment as a matter of law de novo, construing the evidence in the light most favorable to the non-moving party, and "applying the same legal standard as the district court." Hampton v. Dillard Dept. Stores, Inc., 247 F.3d 1091, 1099 (10th Cir. 2001). Given our traditional deference to jury verdicts, judgment as a matter of law is appropriate only when "the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Id. Construing the evidence and inferences therefrom in the light most favorable to Burton with regard to the failure to warn claim, we **AFFIRM**.

**A**

We first evaluate Reynolds' statute of limitations defense. Review of the district court's application of the statute of limitations is de novo. Gibraltar Cas. Co. v. Walters, 185 F.3d 1103, 1104 (10th Cir. 1999). Under Kansas law, Reynolds, as the defendant, bears the burden of proving that the statute of limitations bars the action. Slayden v. Sixta, 825 P.2d 119, 122 (Kan. 1992). The appropriate limitations period for personal injury actions is two years from the time that the injury becomes "reasonably ascertainable" to the injured party. Kan. Stat. Ann. § 60-513(a)(4). Determination of whether an injury is "reasonably ascertainable" requires application of an objective standard to the pertinent

- 14 -

circumstances to determine when a plaintiff obtains knowledge of an injury. Hall v. Miller, 36 P.3d 328, 333 (Kan. App. 2001). In Kansas, when the evidence is in dispute as to when substantial injury first becomes apparent or reasonably ascertainable, resolution of the issue is properly submitted to the trier of fact. City of Wichita v. United States Gypsum Co., 72 F.3d 1491, 1498 (10th Cir. 1996).

In order to resolve the statute of limitations issue the jury was asked first to determine the applicable scope of the term "addiction," and second, when this "addiction" injury was "reasonably ascertainable." At trial Reynolds attempted to broadly define "addictive," as meaning "hard or difficult to quit," which would presumably bar Burton's claims. Burton, on the other hand, presented expert testimony on the classical definition of an "addictive" drug, which would allow a jury to find that his injuries were not reasonably ascertainable at a time which would bar his action. The jury found for Burton, impliedly adopting the more scientifically rigorous meaning of the word "addiction." On appeal, Reynolds does not contest this determination, but rather focuses on the issue of whether Burton's addiction claims are time-barred because they were "reasonably ascertainable" prior to May 25, 1992, two years before he filed his claim.

Regarding the jury's second inquiry, it was uncontroverted that Burton was not subjectively aware of his addiction. This left only the question of whether

Burton's addiction was "reasonably ascertainable" prior to 1992 as determined by an objective standard. Although Kansas law imposes an obligation on persons to investigate available sources of information, that obligation arises only after a party has acquired sufficient facts placing him on notice that he has suffered an injury. See Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 104 F.Supp. 2d 1294, 1302 (D. Kan. 2000). In its response to the first "interrogatory verdict question" denying Reynolds' statute of limitations defense, the jury implicitly rejected the proposition advanced by Reynolds throughout its case that there was sufficient information to require Burton to investigate his possible addiction. Because the evidence before the jury included Burton's testimony that he was not aware of his addiction until he was admitted to the hospital for amputation of his legs in 1993, that he did not go to doctors, that he had never attempted to quit smoking prior to having his legs removed in 1993, and that he smoked because he liked the taste, the jury had adequate facts before it on which to base its denial of the statute of limitations defense. For example, based on this evidence, the jury certainly could have determined that Burton's addiction injury was not reasonably ascertainable because he had never attempted to quit smoking and thus lacked cravings to smoke against his will or other indicia of addiction that would have put him on notice to investigate a potential injury.

Apart from any subjective reasons Burton may have had to investigate his addiction, Reynolds argues that publication of the Surgeon General's report on Nicotine Addiction in 1988 ("1988 Surgeon General's report") objectively placed all smokers on notice that they should investigate their addiction to cigarettes. Although the record shows the intent of the drafters of the 1988 Surgeon General's report was to achieve widespread publicity of nicotine's addictive properties,[2] the record is silent as to both the details and effectiveness of the effort to communicate this information to the American public, and to Kansans in particular.

Moreover, the jury heard evidence of the tobacco industry's efforts to keep alive the "debate" over the health effects of tobacco going back to 1954, or before, with its Frank Statement and the creation of the "open question" campaign.[3] Consistent with this evidence, the jury was also presented with Reynolds' CEO's 1998 claim "that nicotine, by the classical definition of the word, is not addictive to anyone." This testimony, as well as evidence of

---

[2] Dr. Burns and Grunberg, two of plaintiff's experts testified that the intent of the Surgeon General in publishing his 1988 Report was to try to inform the American public of the dangers of nicotine addiction by obtaining extensive publicity of the report. The record is silent on the outcome.

[3] Burton's witnesses presented extensive evidence that, beginning in 1954 and continuing throughout the 43 years that Burton smoked, tobacco companies, including Reynolds, engaged in a deliberate publicity campaign to convince the American public that the existence of negative health consequences from smoking was an "open question."

Reynolds' long-standing practice of obfuscating the addictive nature of cigarettes, provided a relevant contrast for a jury to consider when deciding whether Burton's "addiction" was reasonably ascertainable merely because of the publication of a government report.

As explained above, the burden was on Reynolds to prove that the statute of limitations barred the action. Reynolds cannot complain that it was unreasonable for the jury to find that the 1988 Surgeon General's Report did not put all smokers in American on notice of the dangers of cigarette "addiction," when Reynolds itself did not present convincing evidence on the extent or effectiveness of this publicity. On record review, we are left with the abiding conclusion that there was sufficient evidence for the jury to determine, as it did, that Burton's addiction-based injuries were not reasonably ascertainable prior to May 25, 1992.

**B**

Reynolds contends that Burton failed to establish the elements for a negligent failure to warn claim because he failed to establish that Reynolds owed him a duty or that any breach caused his injuries. To sustain a negligence claim under Kansas law, the plaintiff must prove by a preponderance of the evidence the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Honeycutt v. City of Wichita, 836 P.2d 1128, 1136 (Kan. 1992). Reynolds' appeal focuses on what it contends is

- 18 -

insufficient evidence for the elements of duty and causation. Our review of the district court's denial of a judgment as a matter of law is de novo, and judgment as a matter of law is appropriate only if there is no legally sufficient evidentiary basis for a claim under the controlling law. Hampton, 247 F.3d at 1099.

Proper evaluation of this appeal requires us to determine initially the relevant dates against which to measure Reynolds' duties and knowledge. It is uncontested that Burton began smoking in 1950 when he was 14 or 15 years old, and continued to smoke until some point in 1994-95 after he was diagnosed with PVD and had his legs amputated. Because a manufacturers' duty to warn under Kansas law arises at the time of sale,[4] Reynolds' duty to warn is measured each time it sold cigarettes to Burton from 1950 to a date no later than, July 1, 1969, the effective date of the Public Health Cigarette Smoking Act of 1969.[5]

_____

[4] The Kansas Supreme Court recognized in Patton, 861 P.2d at 1313, that a manufacturer has a post-sale duty to warn of newly discovered latent life-threatening hazards of a product unforeseeable at time of sale. We need not reach the issue of whether this duty is implicated here, as the duty to warn at the time of sale is sufficient for the disposition of this case.

[5] In 1965 and 1969, Congress passed two Acts that affected tobacco companies' legal duty to warn of the health effects of smoking: the Federal Cigarette Labeling and Advertising Act of 1965, and the Public Health Cigarette Smoking Act of 1969. On the basis of these two Acts and the Supreme Court's interpretation of their preemptive effect in Cipollone v. Liggett Group, Inc., 505 U.S. 504, 525 (1992), the district court found as a matter of law that the tobacco purveyors have provided legally sufficient warnings since July 1, 1969, and limited the tobacco companies' duty to warn through their advertising or promotion to the period prior to 1969. Thus, July 1, 1969 became the operative

(continued...)

- 19 -

Reynolds contends the adverse health effects of smoking were common knowledge prior to 1950 and 1969, and that, therefore, Reynolds had no duty to warn of addiction, PVD, or any other serious health effect arising from smoking. In advancing this argument, Reynolds cites to no authority under Kansas law limiting a manufacturers duty to warn about one hazard simply because use of a product is known to present other hazards. On the contrary, Kansas law recognizes a specific duty for manufacturers to warn of its product's reasonably foreseeable dangers. Richter, 45 F.3d at 1468; see also Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 853 (10th Cir. 2003). As a manufacturer, Reynolds had a duty to warn of dangers associated with its product about which it knew, had a reason to know, or should have known, based on its position as an expert in the field. See Wooderson v. Ortho Pharmaceutical Corp., 681 P.2d 1038 (Kan. 1984); Mason v. Texaco, Inc., 741 F.Supp. 1472, 1507-1508 (D. Kan. 1990).[6]

To show such constructive knowledge, Burton presented extensive expert testimony on the scientific and medical literature describing the relationship between smoking and peripheral vascular disease from the 1930s, and continuing throughout the 1950s and 1960s, as well as evidence on research funded by

_____

[5](...continued)
cutoff date of Reynolds' failure to warn liability.

[6] This duty is not dependent on the existence of scientific consensus about the causal relationship between the use of a product and a risk. See id.

tobacco companies, including Reynolds.[7]  Such evidence was clearly sufficient to allow a reasonable jury to determine that Reynolds had a duty to warn of the risks of PVD from 1950 to 1969.

We reject Reynolds' arguments that Burton's PVD-based failure to warn claim fails because Reynolds did not know about the risk of PVD from smoking before 1969.  In making this argument, Reynolds attempts to limit its duty to warn to those dangers of which it had actual knowledge.  By this leger de main Reynolds attempts to recast its legal duty and ignore the substantial evidence in the record supporting the jury's determination that Reynolds, as an expert in the field, should have known of the dangers of smoking and PVD prior to 1969.  Because we conclude that this evidence was sufficient to support a jury determination that Reynolds should have known of the risks from smoking

---

[7] For example, Dr. Burns testified that there had been science on the vaso-constrictive effect of nicotine in the scientific literature dating back to the 1930s.  Both Dr. Burns and Dr. Grunberg testified that Tobacco, a 1961 compilation of smoking and health literature, funded by a tobacco-industry related group to which Reynolds belonged, contained information on the relationship between smoking and PVD, and had been provided to the Surgeon General in 1964.  Significantly, Dr. Burns discussed a letter published in 1954 in the Journal of the American Medical Association that described a patient with PVD in the 1940s, whose symptoms from PVD became quiescent upon stopping smoking in 1941, and remained unchanged until 1949 when he began to smoke again.  Within six months gangrene of his toes had developed, and once more his symptoms abated once he ceased smoking, only to recur once again when he began to smoke.  Further, Dr. Burns testified that, in the 1950s, there had been Reader's Digest and Consumer Reports articles on the possible relationship between smoking and peripheral vascular disease.

outlined in the scientific and medical literature concerning PVD and "addiction" prior to 1950, and assuredly prior to 1969, we similarly conclude that the jury could reasonably find that Reynolds had a duty to warn of these specific dangers.[8]

Reynolds next contends that the evidence unequivocally shows that no warning would have altered Burton's use of cigarettes, thereby challenging the jury's determination on causation.  In order for a plaintiff to recover, Kansas law requires that a product defect actually and proximately cause the claimed injury. Wilcheck v. Doonan Truck & Equip. Co., 552 P.2d 938, 942 (Kan. 1976).  An inadequate warning, however, creates a presumption of causation.  See Wooderson, 681 P.2d at 1057-58; O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1442 (10th Cir. 1987) (applying Kansas law).  Not only does this presumption shift the burden of rebuttal onto the defendant, under Kansas law, the effect of

---

[8] Under Kan. Stat. Ann. § 60-3304(a), when a product complies with legislative regulatory standards that address warnings or instructions, the product shall be deemed not defective by reasons of warnings or instructions unless the claimant proves by a preponderance of the evidence that a reasonably prudent seller could and would have taken additional precautions.  We reject Reynolds' argument that Burton failed to rebut this presumption which arises from Reynolds compliance with federal labeling regulations from 1966 to 1969.  In addition to the evidence we have already discussed on the knowledge imputed to Reynolds as a manufacturer and expert in the field, Burton presented testimony by Bennett Lebow of the Liggett Group, Inc. a cigarette manufacturer, that it was easy to disseminate additional and more adequate warnings to consumers.  Specifically, Lebow testified that Liggett provided a warning that smoking was addictive on all its cigarette packages.  Although instructed on this presumption, the jury determined that Reynolds was liable for failure to warn – in effect, finding the presumption successfully rebutted.

this presumption is to shift the burden of proof to the party against whom the presumption operates.[9] See Ralston, 275 F.3d at 977 n.6; Mason, 741 F.Supp. at 1507-08. Thus, under Kansas law, Reynolds had the burden of proof on causation once Burton established the fact of an inadequate warning. A proper allocation of the burdens of proof in this case is critical, as it is against this allocation that we must weigh the sufficiency of the evidence. See Rajala, 919 F.2d at 615 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Further, a directed verdict favoring parties having the burden of proof may be granted only where they have established their case by evidence that the jury would not be at liberty to disbelieve. Hurd v. Am. Hoist & Derrick Co., 734 F.2d 495, 499 (10th Cir. 1984). This is not the case here.

We conclude that Burton has presented sufficient evidence on causation to sustain the jury's verdict. Although Kansas does not require a plaintiff to testify that he would have behaved differently had he been properly warned, Richter, 45

---

[9] State law determines the effect of any presumptions in a diversity action. Fed. R. Evid. 302; see also Mason, 741 F.Supp. at 1505. Under Kan. Stat. Ann. § 60-414, if the facts from which the presumption is derived have any "probative value as evidence of the existence of the presumed fact," State v. 1978 Chevrolet Automobile, 835 P.2d 1376, 1381 (Kan. App. 1992), both the burden of production and the burden of persuasion shift to the party against whom the presumption operates. Kan. Stat. Ann. § 60-414(a). It is our view that the Kansas Supreme Court would agree that "evidence of an inadequate warning easily meets the liberal test for probative value under the Kansas and federal rules," Mason, 741 F.Supp. at 1506, and is, consequently, a burden shifting presumption.

F.3d at 1472, Burton did testify that he quit smoking after being warned by his doctors that he would lose his arms if he continued to smoke, and further that he would not have begun smoking in 1950 if he had been shown "this" at that time. Because we construe the evidence and its inferences in the light most favorable to the non-moving party, as we must, we interpret the term "this" to refer to Burton's injuries – his addiction, PVD, and resultant loss of his legs.

Additionally, Reynolds argues that Burton's failure to quit smoking in the six-month interim from his initial medical visits to the amputation of his legs in January 1994, and his intermittent relapses after his discharge from the hospital mandates the conclusion that no warning would have been effective in stopping Burton from smoking. We disagree. Burton's difficulty in quitting smoking, in light of his addiction and his 43-year smoking history, does not mandate such a conclusion by us or by the jury.[10]

Reynolds' fundamental argument at trial, and in this appeal, is that "no matter what warning was issued to Burton, he would have continued to smoke Camel cigarettes, become addicted, and develop[ed] PVD." See Burton, 208 F.Supp. 2d at 1193. Yet, none of the general warnings relied upon by Reynolds prior to 1969 included the risks of developing addiction and PVD. General

---

[10] Dr. Grunberg, a Burton expert, testified that it is common for addicted smokers to have to attempt to quit several times before being ultimately successful.

- 24 -

warnings on the dangers of smoking to health do not necessarily have the same impact as a frank warning that smoking may cause the loss of a limb. The consequences of this latter danger are stark, and so would be a person's evaluation of this risk. Because, on this record, the proof points more than one direction on the issue of causation, and because it is the jury's task to weigh the conflicting evidence, the jury's verdict must stand.

After assessing Reynolds' contentions on insufficiency of the evidence in light of the underlying burdens of proof, we take the district court's view that although Reynolds introduced evidence "relevant to causation on which a reasonable jury could have based a decision that the presumption of causation had been rebutted, the jury did not do that." Burton, 208 F.Supp. 2d at 1194. Not only does the record disclose sufficient evidence to uphold the jury's verdict on causation; when viewed in light of the Kansas presumption of causation and the burdens of proof resulting therefrom, the jury's verdict becomes unassailable.

## C

In sum, we hold that Burton's addiction based negligent failure to warn claim is not barred by the statute of limitations and that his addiction and PVD based negligent failure to warn claims are supported by sufficient evidence. Accordingly, the jury's verdict on Burton's pre-1969 negligent failure to warn claim must be affirmed.

## IV

Finally, the jury rendered a verdict in Burton's favor on his negligent failure to test claim. Burton, 205 F. Supp. 2d at 1255. Reynolds argues that: (1) Burton's addiction based failure to test claim is barred by the statute of limitations; and (2) Burton's PVD based failure to test claim fails because, under Kansas law, failure to test cannot be established absent proof that the failure to test resulted in a design defect, warning defect, or manufacturing defect that caused his injuries, and there is no such proof here. We disagree as to both arguments.

To overcome the jury's verdict for Burton on the claim of negligent failure to test, Reynolds again asserts a statute of limitations defense to the addiction-based claims. We reject this argument for the same reasons stated in section IIIA, and turn directly to analysis of Burton's PVD based failure to test claim. We review the district court's interpretation of state law de novo. Blackhawk-Cent. City Sanitation, 214 F.3d at 1188.

In Lindquist v. Ayerst Laboratories, Inc., the Supreme Court of Kansas recognized that a manufacturer has a duty to test and inspect its products:

> The rule is that a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby

produces a defective article which causes damage while being put to an ordinary anticipated use, is liable for such damages.

607 P.2d 1339, 1350 (Kan. 1980) (citation omitted). That court also noted that the plaintiff must prove that the tests would have been effective. Id. In other words, the plaintiff must prove that the manufacturer's failure to test its product resulted in a defective product that caused injury to the plaintiff. See id.

Kansas law recognizes only three ways in which a product may be defective: (1) a manufacturing defect; (2) a warning defect; and (3) a design defect. Delaney v. Deere & Co., 999 P.2d 930, 936 (Kan. 2000). Accordingly, a plaintiff alleging a breach of the duty to test must prove that one of these three types of product defects caused the claimed injury.[11]

Reynolds highlights the Lindquist court's comment that "the plaintiff cannot succeed where he fails to allege or prove that tests or inspections would have been effective." Lindquist, 607 P.2d at 1350 (citation omitted). Although it is unclear if this is a requirement in all negligent failure to test claims in Kansas, Burton certainly presented evidence that Reynolds was involved in a gentlemen's agreement with the rest of the tobacco industry not to perform animal testing "on

_____

[11] Our holding in Kinser v. Gehl Co., 184 F.3d 1259 (10th Cir. 1999), abrogated on other grounds by Weisgram v. Marley Co., 528 U.S. 440, 453, 457 (2000), is not to the contrary. In Kinser, we held that it was proper under Kansas law to submit a duty to test instruction to the jury because the jury could reasonably conclude based on the evidence that the product was defectively designed. Id. at 1273.

their premises" in the United States. Additionally, a former Reynolds' employee testimony that Reynolds had performed "state of the art" animal testing from approximately 1967 to 1970 that would have benefitted public health. This testimony provided a basis for inferences that when Reynolds discovered that these tests produced smoking-related disease in animals, it halted testing and concealed the evidence.

In Kansas, the core purpose of a duty to test is to avoid production of defective products. This jury specifically declined to find a design defect, and there was no claim of a manufacturing defect. As discussed in Section III above, the record supports the jury's conclusion that Burton proved the existence of a warning defect. There is sufficient record evidence to allow the jury to conclude that PVD was a reasonably foreseeable risk of smoking such that Reynolds should have investigated and warned of this potential danger. Nevertheless, under the facts of this case, the jury's finding on the negligent failure to test claim is co-extensive with its finding on the negligent failure to warn claim, and either claim supports the compensatory damages awarded by the jury.[12]

**V**

---

[12] Reynolds concedes that the same compensatory damages flowed from all three causes of action–fraudulent concealment, failure to warn, and failure to test. Thus, the jury's negligent failure to test verdict in this case, when joined with the jury's determination that there was no design defect, lead us to conclude that an independent tort was not committed.

For the reasons stated above, we **REVERSE** the jury verdict on liability as to the fraudulent concealment claim, and its pendent award of punitive damages; **AFFIRM** the jury verdict on the failure to warn and failure to test claims with their attendant award of compensatory damages, and **REMAND** the case for entry of the appropriate judgment in favor of Reynolds on the fraudulent concealment claim.

No. 02-3262, <u>Burton v. R.J. Reynolds Tobacco Company</u>
**EBEL,** Circuit Judge, dissenting**.**

Although I join Sections I and II of the majority opinion, I respectfully dissent from Section III (affirming the jury verdict on Burton's pre-1969 negligent failure to warn theory) and Section IV (affirming the jury verdict on Burton's pre-1969 negligent failure to test theory).

## I. Pre-1969 Negligent Failure to Warn Claim

The jury rendered a verdict in Mr. Burton's favor on his pre-1969 negligent failure to warn claim. <u>Burton v. R.J. Reynolds Tobacco Co.</u>, 205 F. Supp. 2d 1253, 1255 (D. Kan. 2002). Reynolds argues, among other things, that (a) the statute of limitations bars Mr. Burton's addiction-based failure to warn claim; and (b) the jury's verdict on Mr. Burton's pvd-based failure to warn claim is not supported by sufficient evidence. I agree with Reynolds as to both arguments.

### A. Addiction-Based Claim: Statute of Limitations

Personal injury tort actions must be brought within two years of the accrual of the action. Kan. Stat. § 60-513(a)(4); <u>Smith v. Yell Bell Taxi, Inc.</u>, 75 P.3d 1222, 1225 (Kan. 2003). An action "shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act,

then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." Kan. Stat. § 60-513(b).

The term "reasonably ascertainable" does not mean "actual knowledge" but is "an objective standard based on an examination of the surrounding circumstances." Davidson v. Denning, 914 P.2d 936, 943, 948 (Kan. 1996). Kansas law expressly imposes on a plaintiff an obligation to investigate available sources. See id. at 946; Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 104 F. Supp. 2d 1294, 1298 (D. Kan. 2000) (applying Kansas law).

Mr. Burton filed this lawsuit against Reynolds on May 25, 1994. The district court submitted to the jury the question of whether Mr. Burton could reasonably have discovered his addiction prior to May 25, 1992, and the jury concluded that he could not reasonably have discovered his addiction prior to that date. Accordingly, the district court held that Mr. Burton's claims were not time barred. Burton v. R.J. Reynolds Tobacco Co., 208 F. Supp. 2d 1187, 1209-10 (D. Kan. 2002). Reynolds now argues that the jury's determination was not supported by substantial evidence.

The evidence presented at trial indicates that on May 3, 1988, the Surgeon General presented to Congress a report entitled "Nicotine Addiction." The three major conclusions of the report were that cigarettes are addicting, that nicotine is the drug in cigarettes that causes addiction, and that the addictive properties of

nicotine are similar to the addictive properties of heroin and cocaine. The report recommended that health care organizations should initiate or strengthen efforts to inform the public about the addictive properties of cigarettes and that Congress should require cigarette companies to attach an addiction warning on cigarette labels and advertisements.

One of the scientists who helped draft the report testified regarding one of the purposes of the report:

> Looking at the information, we wanted to make sure that there were conclusions that were clear to the American people. It also was our belief that the findings of the report were so powerful and so important and that the message of their findings needed to get out in a clear way, so we decided to see what information could be reached, and it ended up we could fit the major findings into those three – and we use the term sound bytes, that we knew could be presented; the public would get it because, you know, precious time, whether in newspapers or in the media, that they would understand it and could clearly communicate, and one could read the whole report or portions of it for the support.

This testimony demonstrates that the report was designed to achieve widespread publicity to inform smokers like Mr. Burton of the addictive properties of nicotine. Indeed, the title of the report was changed from "Pharmacological Basis of Cigarette Smoking" to "Nicotine Addiction" in order to make the report more readily accessible to the tobacco-consuming public.

This evidence establishes that long-time cigarette smokers like Mr. Burton would have had good reason by 1988 at the very latest to investigate a possible

addiction. See Soliman v. Philip Morris Inc., 311 F.3d 966, 973 (9th Cir. 2002) (characterizing 1988 report as "hardly [an] obscure detail[] in the historical record"). Because Kansas expressly imposes upon plaintiffs a duty to investigate potential injury, Davidson, 914 P.2d at 946, the evidence suggests that Mr. Burton's addiction injury was "reasonably ascertainable" by 1988.

Mr. Burton offered no relevant evidence to the contrary. He points to a statement by Reynolds' CEO in a 1998 deposition that "I don't believe that nicotine, by the classical definition of addiction, is addictive to anyone." Mr. Burton fails to illustrate the relevance of this isolated, unpublicized comment in a deposition taken four years after Mr. Burton filed this lawsuit to the issue of whether a reasonable smoker would have realized his or her addiction to cigarettes in 1992. Mr. Burton also points to evidence that he had no idea he was addicted to cigarettes until 1993 when he became concerned about the circulatory problem in his legs. Kansas law could not be more clear, however, that Mr. Burton's subjective knowledge of his injury is not dispositive. Rather, Mr. Burton is charged with constructive knowledge of information that is available through reasonable investigation. Davidson, 914 P.2d at 948 (explaining that term "reasonably ascertainable" does not mean "actual knowledge").

I conclude that the evidence supports no other conclusion than that the reasonable smoker had good cause to investigate his or her possible addiction to

cigarettes by 1988 at the very latest, when the Surgeon General published its report on nicotine addiction. See Bielicki v. Terminex Int'l Co., 225 F.3d 1159, 1162 (10th Cir. 2000) (stating that jury finding is reversible if evidence "points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found" (internal quotation omitted)). The limitations period on Mr. Burton's addiction-based failure to warn claim therefore expired in 1990, four years before Mr. Burton brought this lawsuit. Accordingly, I believe this portion of his claim is barred by the statute of limitations.[1]

## B. PVD-Based Claims: Sufficiency of the Evidence

To sustain a negligence claim under Kansas law, the plaintiff must prove by a preponderance of the evidence the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Honeycutt ex rel. Phillips v. City of Wichita, 836 P.2d 1128, 1136 (Kan. 1992). Of particular importance here are the elements of duty and causation. As to the element of duty, "a manufacturer has a duty under Kansas law to warn consumers and users of its products when it knows or has reason to know that its product is or is likely to be dangerous during normal use." Richter v. Limax Int'l, Inc., 45

---

[1]Mr. Burton's addiction-based failure to test claim is also time barred. See discussion infra.

F.3d 1464, 1468 (10th Cir. 1995) (applying Kansas law) (internal quotations omitted). The duty extends only to those dangers "arising from the foreseeable use and misuse of a product that are known or are readily foreseeable in the state of art." Id. at 1471.

As to the element of causation, Kansas law requires evidence that a defect in the product actually and proximately caused the plaintiff's injury. Wilcheck v. Doonan Truck & Equip., Inc., 552 P.2d 938, 942 (Kan. 1976). An inadequate warning, however, creates a presumption of causation. See Wooderson v. Ortho Pharm. Corp., 681 P.2d 1038, 1057-58 (Kan. 1984); O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1442 (10th Cir. 1987) (applying Kansas law). "The effect of this presumption is to place the burden on [defendant] to rebut it." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 977 n.6 (10th Cir. 2001) (applying Kansas law (internal quotation omitted)). Kansas therefore does not require a plaintiff to testify that he would have behaved differently had he been properly warned. Richter, 45 F.3d at 1472.

I conclude that Mr. Burton has presented insufficient evidence of causation to sustain the jury's verdict. The only two items of evidence to which Mr. Burton has directed our attention are either insufficient or irrelevant.

Mr. Burton suggests that his receptiveness to a warning is demonstrated by his testimony that he would not have begun smoking in 1950 had he known of the

risk of pvd at that time. This testimony is not relevant evidence of causation. As discussed above, this testimony indicates that Mr. Burton may have been receptive to information regarding the risk of pvd before he started smoking in 1950 but says nothing of his receptiveness to such information after he started smoking and became addicted to cigarettes. Only if Mr. Burton introduced evidence that Reynolds should have warned consumers of the risk of pvd *in 1950* would Mr. Burton's testimony that he was receptive to a warning in 1950 be relevant. This Mr. Burton has failed to do. The evidence contains an anecdotal scintilla of evidence that Reynolds may have had reason to suspect some association between pvd and cigarette smoking in 1954,[2] but there is no evidence that Reynolds had or should have had knowledge of the risk of pvd at any earlier date. The record reflects that the 1940s and 1950s, because of the tremendous increase in smoking rates during World War II, were volatile decades in terms of scientific knowledge of the health risks associated with cigarette smoking. As such, the risks of which Reynolds should have been aware in 1954 cannot be inferred to be the risks of which it should have been aware in 1950. Because Mr. Burton has not pointed to any evidence that Reynolds had a duty to warn consumers of the risk of pvd in

---

[2]Specifically, Mr. Burton presented a 1954 Letter to the Editor, published in the Journal of the American Medical Association, providing an anecdotal report of a single smoker who suffered vascular disease in his extremities.

1950, Mr. Burton's testimony that he would not have begun smoking in 1950 had he been warned of that risk is not relevant evidence of causation.

Mr. Burton also insists that he is entitled to a presumption that he would have read and heeded warnings had they been provided. Mr. Burton is entitled to such a presumption if he proves the warnings were inadequate, but that presumption is rebuttable. See Ralston, 275 F.3d at 977 n.6. Even assuming that Mr. Burton had proven that the warnings were inadequate, which I do not believe,[3] Mr. Burton's trial testimony and other evidence unequivocally rebutted the presumption. The evidence clearly demonstrated that Mr. Burton disregarded all warnings after he began smoking, at least until those warnings were accompanied by the actual loss of his legs. Per this evidence, it is clear beyond any doubt that any warnings by Reynolds of the risk of pvd associated with cigarette smoking would have gone unheeded.

I conclude that Mr. Burton has presented insufficient evidence of causation to sustain the jury's verdict on the pvd-based portion of his negligent failure to warn claim.

---

[3]A warning that cigarette smoking is hazardous to one's health seems to me adequately to put a smoker on notice that cigarette smoking is hazardous to one's health. Once a smoker is put on notice of such risk, the duty of inquiry falls upon the smoker to probe the medical nuances of those risks with his or her doctor.

## II. Pre-1969 Negligent Failure to Test

Reynolds argues, among other things, that (a) Mr. Burton's addiction-based failure to test claim is barred by the statute of limitations; and (b) Mr. Burton's pvd-based failure to test claim fails because, under Kansas law, failure to test cannot be established absent proof that the failure to test resulted in a design defect, warning defect, or manufacturing defect that caused his injuries, and there is no such proof here. I agree with Reynolds as to both arguments.

Mr. Burton's addiction-based failure to test claim is barred by the statute of limitations for the same reason his addiction-based failure to warn claim is time barred. See discussion supra. Accordingly, I turn directly to Mr. Burton's pvd-based failure to test claim.

In Lindquist v. Ayerst Laboratories, Inc., the Supreme Court of Kansas recognized that a manufacturer has a duty to test and inspect its products:

> The rule is that a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby produces a defective article which causes damage while being put to an ordinary anticipated use, is liable for such damage.

607 P.2d 1339, 1350 (Kan. 1980) (quoting 1 Hursh and Bailey, American Law of Products Liability 2d, § 2:29, at 214 (1974)). The court also noted that the plaintiff must prove that the tests would have been effective. Id. In other words,

the plaintiff must prove that the manufacturer's failure to test its product resulted in a defective product that caused injury to the plaintiff.  See id.

Kansas law recognizes three ways in which a product may be defective:  (1) a manufacturing defect; (2) a warning defect; and (3) a design defect.  Delaney v. Deere & Co., 999 P.2d 930, 936 (Kan. 2000).  Accordingly, a plaintiff alleging a breach of the duty to test must prove that one of these three types of product defects caused his or her injury.

In this case, Mr. Burton cannot claim that one of these three types of product defects caused his pvd-related injury.  First, he neither argues nor points to any evidence that Reynolds' alleged failure to test resulted in a manufacturing defect.  Second, the jury expressly determined that Mr. Burton's injuries were not caused by a defect in Reynolds' design of the cigarettes.

Finally, Mr. Burton presented insufficient evidence that a warning defect caused his pvd-related injury.  See discussion supra.  As discussed above, the record supports no other conclusion than that Mr. Burton would not have responded to a warning from Reynolds after he started smoking.  See id.  Of course, Mr. Burton did present evidence that he may have responded to a warning in 1950 before he ever started smoking.  See id.  However, he has not identified any evidence that by 1950 pvd was a reasonably foreseeable danger of smoking such that Reynolds should have investigated and then warned of the potential

danger.  See Richter, 45 F.3d at 1471 (applying Kansas law) (stating that product manufacturers have duty to test for and then warn of only *foreseeable* dangers, not every conceivable danger).  Accordingly, that Mr. Burton would never have started smoking had he been warned of the danger of pvd in 1950 is not relevant evidence of causation.

Because Mr. Burton cannot claim that any product defect – either a manufacturing, design, or warning defect – caused his injury, he has no cause of action for failure to test.

## CONCLUSION

For the reasons stated above, I would REVERSE the jury's entire verdict on liability and REMAND for entry of judgment as a matter of law in favor of Reynolds on all three claims.